[Cite as *State v. Payne*, 2019-Ohio-4158.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

     Plaintiff-Appellee,          :

                                          No. 107825

     v.                            :

JAMES PAYNE,                            :

     Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  October 10, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-17-619409-B and CR-18-625534-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Andrew F. Rogalski, Assistant Prosecuting Attorney, *for appellee.*

Russell S. Bensing, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1}   James Payne appeals his convictions of multiple drug offenses in two joined cases.  He assigns the following six errors for our review:

I. The trial court erred in denying the Defendant's Motion to Suppress, in violation of Defendant's rights under the 4th Amendment to the United States Constitution.

II. The trial court erred in its admission of certain evidence, in violation of Defendant's Right of Confrontation and to Due Process of Law under the 6th and 14th Amendments of the United States Constitution.

III. The trial court erred in denying Defendant's Motion for Mistrial, in violation of Defendant's right to Due Process of Law under the 14th Amendment to the United States Constitution.

IV. The trial court erred in entering a judgment of conviction in Case No. 625534, which was based upon insufficient evidence, in violation of Defendant's right to Due Process of Law under the 14th Amendment to the United States Constitution.

V. The trial court erred in denying Defendant's Motion to Sever Case No. 619409 from Case No. 625534, allowing the State to proceed to trial on both, in violation of Defendant's right to Due Process of Law under the 14th amendment to the United States Constitution.

VI. The trial court erred in sentencing Defendant as a Major Drug Offender in Case No. 619409.

Finding no merit to the appeal, we affirm the trial court's judgment.

**Substantive Facts and Procedural History**

{¶ 2} In July 2017, two units of the Cleveland Police Department were investigating suspected criminal activities in a building on Broadway Avenue. Sgt. Alfred Johnson of the Cleveland Police Department's Gang Impact Unit was led to the location during his investigation of a gang connected with certain homicides in Cleveland. His investigation of the gang uncovered a rap music video posted on Instagram in which firearms were brandished. By executing a search warrant on

various Instagram accounts, he learned an Instagram screen name "Money Kinz" was involved in the production of the video and James Payne was the individual behind the screen name. Furthermore, the video was produced in a studio called "Factory Studios" in the building on Broadway. The music video was connected to another Instagram screen name "Swezzy Filmz" and Payne's codefendant Mitchell Huckabee was the individual behind that screen name. Based on his investigation, Sgt. Johnson obtained a search warrant for the building.

{¶ 3} Independent of Sgt. Johnson's investigation, the Cleveland Police Department's Vice Unit was investigating suspected drug activity in the building. After conducting a controlled buy, Det. Michael Rinkus also obtained a search warrant for the building.

{¶ 4} On July 14, 2017, the two police units executed together the two independently obtained search warrants. The search was conducted at 6:00 a.m. by the police department's SWAT unit in conjunction with the Vice and Gang Impact Units. When the police entered the building from the rear, they encountered two men, Payne and Huckabee. A large quantity of drugs, including cocaine, heroin, and fentanyl, as well as firearms, were found in a back room behind the room used as a studio.

{¶ 5} Based on the discovery of the drugs, the grand jury returned a 15-count joint indictment (Cuyahoga C.P. No. CR-17-619409-B) against Payne and codefendant Mitchell Huckabee as follows:

- Count 1: trafficking of more than 100 grams of cocaine (F1), accompanied with a major drug offender specification
- Count 2: possession of more than 100 grams of cocaine (F1), accompanied with a major drug offender specification
- Count 3: trafficking of more than 100 grams of heroin (F1)
- Count 4: possession of more than 100 grams of heroin (F1)
- Count 5: trafficking of less than the bulk amount of carfentanil (F4)
- Count 6: possessing of less than the bulk amount of carfentanil (F5)
- Count 7: trafficking of more than the bulk amount of oxycodone, but less than five times the bulk amount (F3)
- Count 8: possession of more than the bulk amount of oxycodone, but less than 5 times the bulk amount (F3)
- Count 9: trafficking of less than the bulk amount of codeine and acetaminophen (F5)
- Count 10: possession of less than the bulk amount of codeine and acetaminophen (F5)
- Count 11: trafficking in less than the bulk amount of alprazolam (F5)
- Count 12: possession of less than the bulk amount of alprazolam (F5)
- Count 13: having weapons while under disability (F3)
- Count 14: having weapons while under disability (F3)
- Count 15: possessing criminal tools (F5)

In addition, all the drug counts contained one-year firearm specifications and forfeitures.

{¶ 6} Payne filed a motion to suppress the evidence, claiming that the Broadway building had two street addresses, 5245 and 5243, and, while the search warrant designated 5243 Broadway as the place to be searched, the police found the drugs and firearms in 5245 Broadway instead. The motion to suppress was subsequently denied by the trial court after a hearing.

{¶ 7} After Payne was indicted in Cuyahoga C.P. No. 619409-B, Payne was placed on electronic monitoring but allowed to stay at the Broadway building. While

the case was pending, the police conducted a second controlled buy sometime toward the end of November 2017. Based on the controlled buy, the police obtained and executed another search warrant. The search uncovered a small quantity of heroin, cocaine, and fentanyl, as well as a firearm.

{¶ 8} Based on the drugs and firearm found in the December search, Payne was indicted in a second case, Cuyahoga C.P. No. CR-18-625534-A. In the second case, he was charged with three counts of drug possession, each accompanied with a one-year firearm specification, and a disability count. The four counts are:

- Count 1: possession of fentanyl (F5)
- Count 2: possession of cocaine (F5)
- Count 3: possession of heroin (F5)
- Count 4: having weapons while under disability (F3)

{¶ 9} Payne moved to sever his trial from his codefendant Huckabee in Cuyahoga C.P. No. 619409-B. The motion became moot when Huckabee reached a plea deal with the state in exchange for testifying against Payne.

{¶ 10} The state moved to join the two cases against Payne. Payne filed an opposition to the motion. The trial court granted the joinder after a hearing.

{¶ 11} The matter proceeded to a jury trial. The state presented 11 witnesses, including Payne's codefendant Huckabee in Cuyahoga C.P. No. 619409-B; Payne did not present any witnesses. Payne was found guilty of all counts in both cases, except for Count 14 (one of the two weapons count) in Cuyahoga C.P. No. 619409-B, which the state had dismissed. The state agreed all the drug possession counts would merge into the drug trafficking counts and it elected to proceed to sentencing on the

trafficking counts. In Cuyahoga C.P. No. 619409, Count 1 (drug trafficking in cocaine) was accompanied with a Major Drug Offender ("MDO") specification. The specification required the trial court to impose the mandatory maximum prison term for a first-degree felony, i.e., 11 years, on Count 1. He was also to serve an additional year for the one-year firearm specification for that count. His sentence on the remaining counts in Cuyahoga C.P. No. 619409-B were to run concurrently to his sentence on Count 1. In Cuyahoga C.P. No. 625534-A, Payne received a term of four years, which was to be served consecutive to the 12-year term in Cuyahoga C.P. No. 619409-B. His sentence for these two cases totaled 16 years.

**Appeal**

{¶ 12} Payne raises seven assignments of error, which we address out of order for ease of discussion. The issues raised include the legality of the July 2017 search, propriety of the joinder of the two cases, admissibility of certain testimony, sufficiency of evidence in the second case (No. 625534), whether the trial court should have declared a mistrial, and whether the state established the weight of drugs for the MDO specification.

### I. Motion to Suppress

{¶ 13} Under the first assignment of error, Payne argues the trial court should have granted the two motions to suppress he filed regarding the July search. He alleges that 5243 and 5245 Broadway Avenue were two separate premises and argues that the evidence seized should be suppressed because while the search warrant referred to 5243 Broadway, the police searched and found the drugs and

firearms in 5245 instead.  He also argues the good-faith exception to the warrant requirement would not apply in this case.

{¶ 14}   The record reflects that the Vice Unit's warrant established probable cause for drug trafficking at:

> The premises known as 5243 Broadway Avenue, Cleveland, Cuyahoga County, Ohio which is a multi-unit dwelling, further described as a brick structure, with a white trim and the numbers 5243 clearly visible on the west side of the residence.

The affidavit by Det. Rinkus attached to that search warrant established probable cause for the entire building, stating:

> 5243 Broadway Avenue, Cleveland Ohio is a multiunit complex with one continuous lower apartment and two separate upstairs.  Payne resides in the entire down apartment where he stores and trafficks his narcotics.  The upstairs apartments, currently under construction are occupied and also used by Payne to facilitate his drug trafficking.

{¶ 15}   The search warrant independently prepared by Sgt. Johnson of the Gang Impact Unit to search the subject premises for evidence relating to criminal-gang materials described the building as:

> The premises known as 5243 Broadway Avenue, in the City of Cleveland Cuyahoga County, Ohio, and more particularly described as a brick retail storefront with unoccupied walk-up apartment dwellings above, with white trim and front doors [,]with the words "Elgin Furniture and Appliance" written in paint on the south wall[.][1]

{¶ 16}  An appellate review of a motion to suppress presents a mixed question of law and fact; we accept the trial court's findings of fact if they are

---

[1] The record reflects that the December search warrant referred to the premises to be searched as "5243/45 Broadway."

supported by competent, credible evidence but must independently determine whether the facts satisfy the applicable legal standard. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "[W]hen there is substantial evidence to support the factual findings of the trial court, the decision on the motion to suppress will not be disturbed on appeal absent an error of law." *State v. Bates*, 8th Dist. Cuyahoga No. 92323, 2009-Ohio-5819, ¶ 36, citing *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542 (1988).

{¶ 17} R.C. 2933.23 prescribes the content of the affidavit supporting the warrant, stating "[a] search warrant shall not be issued until there is filed with the judge or magistrate an affidavit that particularly describes the place to be searched[.]" R.C. 2933.24(A) states that a search warrant shall "particularly name or describe * * * the place to be searched * * *[.]" As to what constitutes sufficient identification of a place to be searched, "'[i]t is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended.'" *State v. Ealom*, 8th Dist. Cuyahoga No. 91140, 2009-Ohio-1073, quoting *Steele v. United States*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed.757 (1925).

{¶ 18} While the building appeared to have been designed as two units with the address 5243 and 5245[2] — with two doors at the front of the building and an

---

[2] Broadway Avenue runs diagonally from northwest to southeast, instead of north to south or east to west. As a result, the 5245 side of the building, where the drugs were found, was referred to in the testimony as either the south or east side, and the 5243 side as the north or west side.

interior door between the two sides — Payne's claim that the building comprised of two separate units during the relevant time period is not supported by the evidence.

{¶ 19} Payne's father, Lawrence Payne, who owned the subject building, testified at the hearing on the motion to suppress that his son lived in the 5245 side, but he was the only person living in the building and had access to the entire building. He met Huckabee once or twice, but did not authorize him to be in the building. When the state showed him a picture of the building taken in July 2017, he acknowledged the north door showed the street number marker 5243, but the marker for the south door 5245 was not clearly visible. When shown another picture of the building taken by the police sometime after July 2017, Lawrence Payne acknowledged there was now a prominent display of the number 5245, but he was not sure who installed the number. He also testified that to go inside the building, he would go through the door on the 5243 side, because the door on the 5245 side was "gated up."

{¶ 20} At the suppression hearing, the state also played video footage from a body camera worn by Det. Rinkus and the footage showed the upstairs rooms were unoccupied. In addition, Sgt. Johnson, who prepared the search warrant for the July search and also participated in the search, testified that the search warrant was intended for the entire building and he used number 5243 to describe the entire building in the search warrant because that was the only number visible from the building. He testified that the street number was only one of the descriptions he provided for the building to be searched.

{¶ 21} Johnson further testified that the upstairs portions of the building were unoccupied and there were two sides downstairs, each side with a front room and a back room. The front room on the south side (the 5245 side) was used as a recording studio. There was a doorway between the two sides, but the door was open and one could freely move between the two sides. Both Payne and Huckabee were arrested in the studio on the 5245 side.

{¶ 22} After the hearing, the trial court denied Payne's motion to suppress, reasoning that the search warrant clearly specified the premises to be searched as the entire brick building, described as a multi-unit dwelling. The court noted that the fact that there was more than one address for the building was immaterial, because the landlord of the building, Payne's father, testified his son had access to the entire building.

{¶ 23} We agree with the trial court's reasoning. "In determining whether a search exceeded the scope of a warrant, the first inquiry is whether the place searched reasonably appeared to be the place described in the warrant." *State v. Pitts*, 4th Dist. Scioto No. 99 CA 2675, 2000-Ohio-1986, 8. *See also State v. Jones*, 8th Dist. Cuyahoga No. 103495, 2016-Ohio-4565, ¶ 16 ("a search warrant which incorrectly lists a street address but otherwise correctly describes the premises to be searched is valid").

{¶ 24} Our review of the two warrants for the July search shows the first warrant described the premises as a "*multi-unit dwelling* * * * with a white trim and the number 5243 clearly visible on the west side of the residence" and the second

warrant described the premises as "a brick retail storefront with unoccupied walk-up apartment dwellings above, with white trim and front doors, with the words 'Elgin Furniture and Appliance' written in paint on the south wall." (Emphasis added.)

{¶ 25} These descriptions depict the premises subject to search as a multi-unit dwelling, which have walk-up apartment *dwellings* upstairs, with white trim and front *doors*. The use of the plural nouns — apartment *dwellings* and front *doors* — indicate the premises to be searched was the multi-unit building, rather than one of two units within the building. In addition, Sgt. Johnson's warrant indicated the words "Elgin Furniture and Appliance" were painted on the wall of the building, which further reflects the premises to be searched was *the building*. Although there was a mailbox on the 5245 side, the number on the mailbox was not conspicuous. The address number 5243 was specifically mentioned in the warrant because it was the only address marker plainly visible on the front of the building.

{¶ 26} Although the owner of the building, Payne's father, testified there were two units in the building and there were two street numbers for the building, according to his own testimony, the only person living in the building was his son and his son had access to the entire building. Huckabee was not a tenant for either of the units. Thus, although the building was designed as two units with separate street numbers, the evidence shows that the building was *not* occupied in that manner at the time of the incident.

**{¶ 27}** Payne cites case law requiring warrants to describe the particular apartment to be searched with sufficient definiteness to preclude a search of the other units in the building. *State v. Smith*, 8th Dist. Cuyahoga No. 79749, 2002-Ohio-1069. This line of case law, however, is not pertinent in this case because here the probable cause, as described in the warrants, attached to *the entire multi-unit building.* The building was described with specificity in the warrants; the street number was but one detail to help the officers identify the building to be searched. Because the police searched the premises identified with particularity in the search warrants, we need not reach the issue as to whether the good-faith exception applies in this case. Payne's first assignment of error is overruled.

## II. The State's Motion for a Joint Trial

**{¶ 28}** Under the fifth assignment of error, Payne argues the trial court should have denied the state's motion to join his two cases for trial and granted his request for severance.

**{¶ 29}** Crim.R. 13 permits a joint trial for multiple indictments. It states: "The court may order two or more indictments or informations or both to be tried together, if the offenses or the defendants could have been joined in a single indictment or information." In turn, Crim.R. 8(A) governs the joinder of offenses in a single indictment. Pursuant to Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected

together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶ 30} If the requirements of Crim.R. 8(A) are satisfied, joining multiple offenses in a single trial is favored because it conserves judicial resources, lessens the inconvenience to witnesses, and minimizes the possibility of inconsistent results before different juries. *State v. Anderson*, 2017-Ohio-931, 86 N.E.3d 870, ¶ 23 (8th Dist.), citing *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), *State v. Schiebel*, 55 Ohio St.3d 71, 86-87, 564 N.E.2d 54 (1990), and *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992).

{¶ 31} A defendant, however, may move to sever charges under Crim.R. 14 if it appears that the defendant may be prejudiced by a joinder of offenses. *State v. Wilson*, 2016-Ohio-2718, 51 N.E.3d 676, ¶ 39 (8th Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990). The defendant bears the burden of proving prejudice. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29. We review a trial court's decision on joinder for an abuse of discretion. *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 90 (8th Dist.).

{¶ 32} When a defendant claims severance is necessary because he or she may be prejudiced by a joinder, the state can refute prejudice under two methods.

> Under the first method, the state must show that the evidence from the other case could have been introduced pursuant to the "other acts" test of Evid.R. 404(B); under the second method (referred to as the "joinder test"), the state does not have to meet the stricter "other acts" admissibility test but only need to show the evidence of each crime joined at trial is "simple and direct."

*Anderson* at ¶ 25, citing *Lott* at 163.

{¶ 33} The record reflects that, before trial, the state filed a motion to join the two cases for trial. Payne filed a response opposing the joinder. At the hearing for the state's motion for joinder, the stated argued the charges on the two cases stemmed from the execution of search warrants on the same premises conducted by the same detectives, which uncovered similar evidence, and therefore joinder was permitted under Crim.R. 8(A). The state argued furthermore that the evidence for the second case (stemming from the December search) would be admissible in the first case (stemming from the July search) as other-acts evidence, and vice versa. The state also argued the evidence in the two cases are "simple and direct." The trial court agreed and denied Payne's request for severance. On appeal, Payne argues the trial court should have granted his request for severance because evidence from one drug case would constitute improper "other acts" evidence in the other case, and he also argues the evidence in these two drug cases are not "simple and direct."

{¶ 34} Payne does not dispute that the joinder of the two cases was permitted here under Crim.R. 8(A), which allows multiple offenses to be tried together when they are of the same character or are based on two or more acts that are part of a course of criminal conduct. He only claims joinder was not proper because he was prejudiced by it.

{¶ 35} Initially, we note when a defendant fails to renew a Crim.R. 14 motion for severance either at the close of the state's case or the close of all evidence, the defendant waives all but plain error on appeal. *Nitsche*, 2016-Ohio-3170, 66 N.E.3d

135, at ¶ 90. Payne failed to renew his request to sever, and therefore, he must now demonstrate plain error. Plain error exists only if the outcome of the trial clearly would have been otherwise, but for the error. *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 61.

{¶ 36} We do not find the trial court's decision not to sever the two cases to be plain error. The trial court reasoned that the two cases are separate and distinct and the jurors were unlikely to be confused. We agree. The "simple and direct" test is satisfied when evidence is simple and direct enough that the jury can easily segregate the evidence. *State v. Johnson*, 88 Ohio St.3d 95, 110, 723 N.E.2d 1054 (2000). Furthermore, "[a] trier of fact is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lunder*, 8th Dist. Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33, citing *Torres*, 66 Ohio St.2d at 343-344, 421 N.E.2d 1288.

{¶ 37} At trial, the detectives described two controlled buys conducted several months apart that led to two separate searches of the premises, in July 2017 and December 2017, respectively. During the July search, both Payne and Huckabee were present and the police discovered a large quantity of drugs; during the December search, no one was present and the police discovered only a small quantity of drugs. The evidence for each case is distinct and uncomplicated, and there was no conflation or overlap of proof. The "simple and direct" test is met in this case. If the state can satisfy the "simple and direct" test, an accused is not prejudiced by joinder regardless of the admissibility of the evidence under

Evid.R. 404(B). *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. Therefore, we do need to address whether the state meets the "other-acts" test. The joint trial was not improper in this case. The fifth assignment of error is without merit.

### III. Admission of Evidence at Trial

{¶ 38} Under the second assignment of error, Payne argues the trial court committed several reversible errors in admitting improper testimony on several occasions. We review the evidentiary issues raised by Payne with the recognition that the admission or exclusion of evidence lies in the sound discretion of the trial court and a reviewing court will not reverse the trial court's decision absent an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### a. Gang Affiliation

{¶ 39} The first evidentiary issue involves testimony regarding the involvement of the police department's Gang Impact Unit in the July 2017 search. Payne argues that, because the testimony showed that he was not in a gang, the testimony regarding the Gang Impact Unit's participation in this case was irrelevant, gratuitous, and prejudicial.

{¶ 40} Sgt. Mitchell Sheehan of the Vice Unit in the police department, testified regarding the July 11 search and mentioned that the Gang Impact Unit was present during the search under a separate warrant. Det. Lawrence Smith was asked

why the police officers from the Gang Impact Unit also participated in the search, and he stated that it was "[b]ecause they [the Gang Impact Unit] already had an investigation going on regarding Mr. Payne."

{¶ 41} Sgt. Johnson from the Gang Impact Unit testified how his investigation of the gang activities in Cleveland led him to the subject building. Before his testimony regarding his investigation, the state first elicited testimony from Johnson to establish that he was not there to testify that Payne was in a gang. Johnson explained that a war between two gangs resulted in several homicides and his investigation of the warring gangs uncovered a music video featuring a rapper who was a known gang member in the Cleveland area and the video displayed multiple guns. Johnson's investigation in social media revealed that the video was produced at the studio in the Broadway building and Payne appeared in the video. The police then learned the building was owned by Payne's father, and Payne stayed at the building. Based on his investigation, Sgt. Johnson prepared and obtained a search warrant to search the Broadway building for computer devices relating to the music video and the firearms.

{¶ 42} Payne claims the testimony alluding to gang activities was irreverent and prejudicial because he was not a gang member. In reviewing this claim, we are aware that "[t]rial courts must treat evidence of gang affiliation with care since most jurors are likely to look unfavorably upon a defendant's membership in a street gang." *State v. Dorsey*, 5th Dist. Stark No. 2014CA00217, 2015-Ohio-4659, ¶ 42, citing *United States v. Jobson*, 102 F.3d 214, 219, fn. 4 (6th Cir.1996).

{¶ 43} Payne was not charged with gang affiliation. Although Sgt. Johnson testified that his investigation of gang activities in Cleveland led him to the subject building on Broadway and it resulted in a joint search of the building by two separate police units, he confirmed that Payne was not a member of a gang before his testimony. Payne's trial counsel did not file a motion in limine to exclude testimony referencing gang activities; in fact, counsel himself elicited testimony from Sgt. Johnson to show that the gang's presence in the building may account for the narcotics and firearms found by the police. As such, we cannot say the admission of trial testimony mentioning suspected gang activities unfairly prejudiced Payne and constituted a reversible error.

**b. "Impeachment" of Codefendant Huckabee**

{¶ 44} Payne argues the trial court erred in permitting the state to impeach Huckabee, the state's own witness. Huckabee was Payne's codefendant in Cuyahoga C.P. No. 619409 but subsequently entered a plea bargain with the state and agreed to testify for the state at Payne's trial.

{¶ 45} The transcript reflects that Huckabee testified that he filmed music videos under the name Swezzy Films. Payne operated a music recording studio in the Broadway building, and Huckabee rented the studio from Payne from time to time to make music videos. Huckabee testified the studio was at the "right" side of the building; the other side of the building was a lounge area; and he would have access to the entire first floor. He also testified that he did not have a key to the building but he occasionally stayed overnight when he worked late at the studio.

When the police searched the building in the early morning of July 14, 2017, he had been editing a video all night and had fallen asleep on a couch in the studio. He was awoken by the SWAT team and heard Payne calling his name.

{¶ 46} When asked if he knew of any drug activity in the building, Huckabee answered, "I really didn't see none" and "Not really, no." The state then asked him if he recalled "telling detectives differently on prior occasions." The defense counsel objected to the question and a sidebar ensued. After the sidebar, the following exchanged occurred:

> Q. Mr. Huckabee, do you recall indications prior to this day where you met with detectives and myself, you know, where the detectives and myself had questions for you, and you provided some information?
> A. Yes.
> Q. Was that more than one occasion?
> A. Yes.
> Q. And do you recall being asked questions about any drug activity that occurred in that studio and providing answers to those questions?
> A. Yes.

(Tr. 1550.)

{¶ 47} Upon further questioning, Huckabee then revealed that at times he may have heard blender noises coming from the back room that may be related to drug activities and that there were people in the building who looked like they may have been on drugs. Huckabee further revealed that Payne had at times asked him to deliver small bags of drugs to people coming by the building to purchase drugs. He had also seen Payne moving the box where the drugs were found by the police.

{¶ 48} The record reflects that, after Huckabee's testimony, a discussion took place between the court and the parties regarding the propriety of the state's examination of Huckabee. The defense counsel argued that the prosecutor improperly cross-examined Huckabee, the state's own witness, without first requesting that Huckabee be declared a hostile witness. The prosecutor explained that he was examining Huckabee under Evid.R. 607, which allows a party to impeach its own witness with a prior inconsistent statement if there is a showing of surprising affirmative damage. However, the prosecutor explained further that he did not have to introduce any prior inconsistent statements to impeach Huckabee because Huckabee on his own subsequently provided testimony on the drug activities on the premises when the prosecutor asked him whether he had previously provided information to the detectives. After the discussion, the trial court determined that the state did not have to invoke Evid.R. 607 to impeach Huckabee and, therefore, Huckabee did not have to be declared a hostile witness.[3] We agree.

---

[3] After the discussion, the trial court analyzed the issue as follows:

So at sidebar we did discuss after [defense counsel] objected to the question that was posed [—] you told the detective something different or words to that effect [—] and [the prosecutor] indicated how he was surprised by the prior answer when he asked * * * did he see drug activity or signs of drug activity on the premises here. He said no.
And so [the prosecutor] indicated how he was surprised that he had not heard that information [Huckabee saying he was unaware of drug activities on the premises] before. He detailed the information that had been given by the witness to the detective and [himself] prior, which was basically what he ended up testifying afterwards. He heard the blender, he saw someone who looked like a junky and so I allowed * * * the witness to answer that question.
It wasn't impeachment at that point. It was an inconsistent statement * * * and witness [was] afforded an opportunity to explain an

{¶ 49} Evid.R 607 ("Impeachment") prohibits a party from impeaching its own witness unless the party is surprised by the testimony and the testimony is damaging. The rule states that:

> (A) Who May Impeach. The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.

Under Evid.R. 607(A), "affirmative damage" occurs if the party's own witness testifies to facts that contradict, deny or harm that party's trial position. *State v. Blair*, 34 Ohio App.3d 6, 516 N.E.2d 240 (8th Dist.1986). Moreover, the state must first have its own witness declared a hostile witness before efforts to impeach that witness can be made. *State v. Holmes*, 30 Ohio St.3d 20, 506 N.E.2d 204 (1987).

{¶ 50} The transcript shows that Huckabee initially denied any knowledge of drug activities on the premise, which came as a surprise to the prosecutor. However, the state did not need to invoke this rule to elicit further testimony from Huckabee about the drug activities. When the prosecutor rephrased the question as "do you recall being asked questions about any drug activity that occurred in that studio and providing answers to those questions?" Huckabee answered yes and

---

> inconsistent statement. It wasn't really necessary to be explained because when he answered the question, he answered not really and then supplied the details * * * that were consistent with what the prosecutor had learned from that witness and the detectives. So it wasn't necessary for anyone to ask the Court for permission to cross-examine. He was not cross-examined. And he was never impeached with an inconsistent statement.

(Tr. 1649-1650.)

went on to testify about his knowledge of the drug activity in the studio. The state did not need to declare Huckabee a hostile witness to impeach him under Evid.R. 607. Payne's claim lacks merit.

### c. Huckabee's Testimony about Fear of Retaliation

{¶ 51} Payne argues the trial court erred in admitting Huckabee's testimony regarding his fear of retaliation. When Huckabee testified about his plea bargain with the state and his agreement to testify, the following exchange occurred:

Q. Are you nervous?
A. Very.
Q. Why?
A. The situation.
Q. What are you nervous about?
A. Everything. The whole me testifying, it's got me nervous.
Q. Anything specific?
A. What could possibly happen afterwards.
Q. What are you worried about that could possibly happen afterwards?
[Objection overruled.]
A. Something could possibly happen to me for coming to testify.

(Tr. 1569-1570.) After this exchange, Payne further revealed that when he met with Payne at a pretrial, Payne asked him if he could take responsibility for the gun charges. Huckabee, however, did not testify that Payne made any threat to him.

{¶ 52} Regarding the admissibility of a witness's testimony about a fear of retaliation for testifying, there is no automatic or absolute exclusion of such testimony, and such evidence goes to the issues of the witness's credibility and bias. *State v. Battle*, 10th Dist. Franklin No. 18AP-728, 2019-Ohio-2931, ¶ 24. *See also State v. Gibson*, 8th Dist. Cuyahoga No. 103958, 2016-Ohio-7778, ¶ 14, citing *People*

*v. Mendoza*, 52 Cal.4th 1056, 132 Cal.Rptr.3d 808, 263 P.3d 1 (2011) ("[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible").  Huckabee's testimony about his reluctance to testify in open court was relevant to his credibility and did not amount to unfair prejudice to be excluded under Evid.R. 403.

### d. Testimony that Defendant Was the Target of the Investigation.

{¶ 53} Payne alleges that there were two other possibilities for the ownership of the drugs found — Huckabee or one of the people who frequented the studio — yet the trial court "repeatedly allowed the State to shift the jury's focus away from [those] possibilities by allowing the State's witnesses to repeatedly testify that Payne was the 'target' of the investigation."  Specifically, Payne cites to five instances at trial where he was referred to as the target of the investigation.

{¶ 54} Our review of the transcript reflects these instances relate to the detectives' accounts of the July controlled buy and the second search of the premises on December 5, 2017.  Payne cites no authority to support his claim that the testimony referring to a defendant being the target of an investigation in similar contexts is inadmissible.  Moreover, independent of the testimony referring to him as the target of the investigation for the controlled buy and for the second search, the state produced incriminating evidence of a large quantity of drugs found in the building occupied by Payne and testimony that Payne was engaged in drug activities.  As such, the testimony from law enforcement officers that he was the target of the

investigation for the controlled buy and the second search is not unfairly prejudicial or otherwise inadmissible.

### e. Testimony Regarding the Controlled Buy

{¶ 55} Payne argues the trial court erred in permitting the state to introduce testimony regarding the confidential reliable informant's purchase of drugs in the controlled buy.

{¶ 56} The record reflects the police conducted two controlled buys in this case by using a confidential reliable informant. The first controlled buy took place on July 11, 2017, as part of an investigation of drug activity involving the subject building. On that day, a confidential reliable informant called a certain phone number to arrange for the drug purchase. Det. Smith testified that when he arrived at the Broadway building to observe the controlled buy, he first saw Payne — whom he referred to as the "target male" — outside the building talking to an individual inside a vehicle and then going behind the building's fence before the informant's vehicle arrived. The informant also went behind the building's fence and emerged five minutes later with drugs. Det. Rinkus met with the informant both before and after the drug purchase. He subsequently prepared a search warrant to search the premises based on the controlled buy.

{¶ 57} The second controlled buy was conducted several days before December 1, 2017, several months after Payne was indicted in Cuyahoga C.P. No. 619409 but allowed to remain at the Broadway building while wearing a monitoring device. Regarding the second controlled buy, Det. Rinkus testified that,

after the informant made a phone call to purchase drugs, he and the informant drove separately to the Broadway location. On this occasion, he observed the informant meeting Payne — whom he referred to as "the target" — in front of the building before both going inside through the north-side door. Based on the controlled buy, Det. Rinkus prepared and obtained another search warrant on December 1, 2017.

{¶ 58} Before trial, Payne's counsel filed a motion for an order directing the prosecutor to reveal the identity of the confidential informant employed in the July controlled buy. At the hearing on the motion, the state explained that Payne was not charged with any offenses regarding the controlled buy and that the informant was only relevant to the validity of the search warrant regarding probable cause. The state explained that it did not intend to call the informant to testify at trial and agreed that the detective involved in the controlled buy could not testify to any hearsay information provided by the informant. The defense counsel subsequently filed a motion in limine regarding the July controlled buy, requesting that Det. Rinkus not be allowed to tell the jury what the informant had told him regarding his drug purchase.

{¶ 59} Payne claims the detectives involved in this case should not be allowed to testify about the July and December controlled buys. Our review of the transcript reflects that the detectives testified about the July controlled buy as part of their drug investigation, which eventually led to the discovery of drugs in the Broadway building where Payne operated a studio. There is no case law authority to support Payne's claim that the police officers cannot testify about a controlled buy

as part of their drug investigation. Our review of the transcript also shows that when the detectives testified about the use of a confidential reliable informant and the two instances of controlled buy conducted by the police, the prosecutor carefully limited the testimony to the detectives' own conduct and their personal observation during the controlled buy. The detectives' observation during the controlled buy was probative to whether Payne was involved in illegal drug activity and at no time did the detectives testify to any hearsay statement made by the informant. Accordingly, Payne's claim lacks merit. The second assignment of error is overruled.

## IV. Mistrial

{¶ 60} Under the third assignment of error, Payne argues the admission of the testimony regarding the confidential informant's purchase of drugs required the trial court to grant a mistrial.

{¶ 61} The trial court should declare a mistrial "only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). Furthermore, trial courts enjoy broad discretion in ruling on motions for mistrial. *State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001). Absent an abuse of discretion, a reviewing court will not reverse a trial court's decision regarding a motion for a mistrial. *State v. Benson*, 8th Dist. Cuyahoga No. 87655, 2007-Ohio-830, ¶ 136.

{¶ 62} In denying Payne's motion for a mistrial, the trial court reasoned that Det. Rinkus's testimony regarding the controlled buy was within the parameters set

forth in Payne's motion in limine. The trial court also indicated he would consider any curative instruction requested by the defense.

{¶ 63} As explained under the second assignment of error, our own review of Det. Rinkus's testimony reflects that the state did not elicit any hearsay testimony from the detective and his testimony was properly limited to his own observation. The trial court did not abuse its discretion in declining to declare a mistrial. The third assignment is overruled.

## V. Sufficiency of Evidence Regarding Cuyahoga C.P. No. 625534-A

{¶ 64} Under the fourth assignment of error, Payne argues the evidence discovered in the December search was insufficient to support his conviction of drug possession in Cuyahoga C.P. No. 625534-A because at the time the police found the drugs in the Broadway building he was held in the county jail.

{¶ 65} The record reflects that, after his indictment for the first case (Cuyahoga C.P. No. 619409-B), Payne was placed on electronic monitoring as a condition of his bond and he was permitted to stay at the Broadway premises. Three days before December 1, 2017, Det. Rinkus conducted a second controlled buy. After the informant made a phone call to purchase drugs, Det. Rinkus and the informant drove separately to the Broadway building. On this occasion, he observed the informant meeting Payne before going inside the building together. Based on the controlled buy, Det. Rinkus prepared and obtained another search warrant on December 1, 2017, to search the building. On December 3, 2017, two days before the police executed the search warrant, however, Payne violated his GPS tracking unit

rules by going to an unapproved location and was returned to the county jail. As a result, the Broadway building was unoccupied at the time of the search on December 5, 2017. During the search, the police found a rifle, a small amount of drugs, and packaging material. Det. Rinkus testified he was not aware that at the time of the search, Payne had been returned to the county jail.

{¶ 66} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 67} Pursuant to R.C. 2925.01(K), "possession" means "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." Possession of a controlled substance may be actual or constructive. *State v. Mann*, 93 Ohio App.3d 301, 308, 638 N.E.2d 585 (8th Dist.1993). "Actual possession requires ownership and, or, physical control." *State v. Messer*, 107 Ohio App.3d 51, 56, 667 N.E.2d 1022 (9th Dist.1995). Constructive possession, on the other hand, exists when a person "knowingly exercises dominion and control over an object, even though that object may not be within his immediate

physical possession." *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus.

{¶ 68} The evidence presented by the state in Cuyahoga C.P. No. 625543-A shows that three days before December 1, 2017, during a controlled buy, Payne was observed meeting with the confidential reliable informant outside the Broadway building before the two went inside the building. On December 3, 2017, Payne was returned to the county jail after violating his bond conditions. Two days later, on December 5, when searching the building, the police found a rifle and drugs on the first floor of the building. There is no doubt the state only produced evidence of Payne's constructive, rather than actual, possession of the drugs and firearm found on December 5. There is also no doubt the state's evidence to support Payne's possession was entirely circumstantial. However, constructive possession may be proved by circumstantial evidence alone. *State v. Trembly*, 137 Ohio App.3d 134, 141, 738 N.E.2d 93 (8th Dist.2000). Viewing the evidence in a light most favorable to the prosecution, we conclude any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Payne's fourth assignment of error is overruled.

## VI. Weight of the Drugs and the Major Drug Offender Specification

{¶ 69} Under the sixth assignment of error, Payne argues the state failed to establish the weight of the cocaine and heroin found, and the court improperly sentenced him for the MDO specification on Count 1 (trafficking in cocaine) by allowing the state to combine the weight of the two drugs.

{¶ 70} Ohio's MDO specification statute designates a defendant convicted of trafficking or possessing over 100 grams of certain drugs as an MDO. When a drug offender is found to be an MDO, the penalty is enhanced. The court must impose the mandatory maximum prison term prescribed for a first-degree felony (11 years). Payne was found to be a MDO under R.C. 2925.03(C)(4)(g), which provides:

> If the drug involved in the violation *is cocaine or a compound, mixture, preparation or substance containing cocaine*, whoever violates division (A) of this section is guilty of trafficking in cocaine. The penalty for the offense shall be determined as follows: * * * (g) If the amount of the drug involved equals or exceeds one hundred grams of cocaine and regardless of whether the offense was committed in the vicinity of a school or in the vicinity of a juvenile, trafficking in cocaine is a felony of the first degree, the offender is a major drug offender, and the court shall impose as a mandatory prison term the maximum prison term prescribed for a felony of the first degree.

(Emphasis added.)

{¶ 71} In Cuyahoga C.P. No. 619409-B, Count 1 and Count 3 charged Payne with trafficking in cocaine and heroin, respectively. Count 1 (trafficking in cocaine) was accompanied with a MDO specification, but not Count 3 (trafficking in heroin). The trial court sentenced Payne to 11 years on Count 1 (trafficking in cocaine) pursuant to the MDO specification.

{¶ 72} The testimony shows that, during the July search, Det. Rinkus and Det. Smith found a metal box in a back room behind the studio and the box contained multiple large bricks of brown powder and white powder. At trial, Brian Marosan of the Cuyahoga County Regional Forensic Science laboratory testified to the drugs found in the box and the state submitted two exhibits to show the weight

of the drugs.  Exhibit No. 112 included three plastic bags: the first bag contained a mixture of heroin and cocaine weighing 67.18 grams; the second bag contained a mixture of heroin and cocaine weighing 69.39 grams; and the third bag contained a mixture of heroin, cocaine, and carfentanil, weighing 6.66 grams.

{¶ 73} Thus, based on the first and second bag, there was evidence of a total of 136.57 grams of a mixture of heroin and cocaine.  Adding the third bag, which contained 6.66 grams of a mixture of three drugs, the total weight of drugs in exhibit No. 112 is 143.23 grams.  In addition, the state's exhibit No. 113 contained 62.19 grams of pure cocaine.

{¶ 74} The state, citing *State v. Gonzalez*, 150 Ohio St.3d 276, 2017-Ohio-777, 81 N.E.3d 419, argues the state was permitted to use the weight of the drug mixtures to establish the weight necessary for the MDO specification accompanying Count 1 (cocaine trafficking).  We agree.

{¶ 75} In a prior decision, *State v. Gonzales*, 150 Ohio St.3d 261, 2016-Ohio-8319, 81 N.E.3d 405, the Supreme Court of Ohio held that in prosecuting cocaine-possession offenses under R.C. 2925.11(C)(4)(b) through (f) involving mixed substances, the state must prove that the weight of the *actual or pure* cocaine, *excluding* the weight of any filler materials, meets the statutory threshold.  The Supreme Court of Ohio subsequently reconsidered that decision, however.  In the reconsidered decision, *Gonzalez*, 150 Ohio St.3d 276, 2017-Ohio-777, 81 N.E.3d 419, the court held that that "the entire 'compound, mixture, preparation, or substance,' including any fillers that are part of the usable drug, must be considered for the

purpose of determining the appropriate penalty for cocaine possession under R.C. 2925.11(C)(4)." *Id.* at ¶ 3. The court cites the definition of cocaine in R.C. 2925.01(X)(3) to include "a 'salt, compound, derivative, or preparation' of a substance that is a cocaine salt or base cocaine." *Id.* at ¶ 10. The court emphasized the statutory definition of cocaine plainly encompasses "a compound or preparation that includes cocaine[, and] 'compound' means 'something (as a substance * * *) that is formed by a union of * * * ingredients.'" *Id.*, quoting *Webster's Third New International Dictionary* 466 (1986).

{¶ 76} The present case involved cocaine mixed with other drugs, heroin and carfentanil, rather than cocaine mixed with inert fillers as in *Gonzales*. The applicability of *Gonzales* to mixtures involving *multiple* controlled substances is therefore the issue before us.

{¶ 77} In *State v. Pendleton*, 2d Dist. Clark Nos. 2017-CA-9 and 2017-CA-17, 2018-Ohio-3199, the panel also encountered the issue of determining the weight of drugs when two controlled substances were combined in a mixture. There, the defendant was found with 49.67 grams of a mixture of cocaine, fentanyl, and heroin, and 83.95 grams of a mixture of fentanyl and heroin. The defendant challenged his convictions of trafficking and possessing fentanyl claiming there was insufficient evidence for the weight of the actual fentanyl in the mixtures. The panel majority first determined that a mixture was "'the blending of several ingredients without an alteration of the substances, each of which retains its own nature and properties.'" *Id.* at ¶ 17, quoting *Webster's New Twentieth Century Dictionary* 1079 (1964).

Citing the plain language of R.C. 2925.01(D)(1)(d), which governs the measurement of the statutory bulk amount of fentanyl and requires the measuring of "compound, mixture, preparation, or substance" that contain fentanyl, the panel majority reasoned the statute does not distinguish between a pure fentanyl and a mixture that contains fentanyl, nor was the reference to mixtures limited to those containing a single drug. *Id.* at ¶ 18. The panel majority therefore affirmed the defendant's convictions, although it expressed a concern over the treatment of a controlled substance as a filler when two controlled substances are put together in a mixture.

{¶ 78} In the instant case, R.C. 2925.03(C)(4)(g) provides that an offender is an MDO "[i]f the drug involved in the violation is cocaine or a compound*, mixture, preparation, or substance containing cocaine,* * * * [and] the amount of the drug involved equals or exceeds one hundred grams of cocaine * * *." (Emphasis added.) The state produced evidence for three mixtures containing cocaine, weighing 67.18 grams, 69.39 grams, and 6.66 grams, respectively, as well as 62.19 grams of pure cocaine. Therefore, in addition to 62.19 grams of pure cocaine, there are three mixtures containing cocaine weighing 143.23 grams, well in excess of the statutory threshold of 100 grams required for the MDO specification. Although *Gonzales* may not be directly applicable, it directs us to view the plain language of the statute when determining the quantity of the drug. R.C. 2925.03 plainly provides that if the cocaine or a mixture containing cocaine equals or exceeds 100 grams, the offender is an MDO.

{¶ 79} Like the panel majority in *Pendleton*, we also question the propriety of the state's ability to use the same mixture containing multiple drugs for evidence of the weight of the multiple drugs contained in the mixture. The state's potential ability to double count the drugs raises a potential due process concern. However, in the absence of a clear statutory mandate to the contrary, we adhere to the plain language of the statute and affirm the MDO specification for Payne's possession and trafficking of cocaine. In addition, we note that the state in this case only charged Payne with the MDO specification in possessing and trafficking cocaine, but not in trafficking and possession of heroin. The state did not use the evidence of the same cocaine-heroin mixtures to obtain multiple convictions of an MDO specification. The sixth assignment of error is overruled.

{¶ 80} The trial court's judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

SEAN C. GALLAGHER, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR