[Cite as *State v. Cottingham*, 2020-Ohio-4220.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 109100 |
| v. | : | |
| RANDY COTTINGHAM, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 27, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-625113-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Eleina Thomas, Assistant Prosecuting Attorney, *for appellee.*

Thomas A. Rein, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant, Randy Cottingham, appeals from the trial court's judgment finding him guilty of aggravated burglary, aggravated robbery, kidnapping, theft, improperly discharging a firearm into a habitation, and felonious assault. Finding no merit to the appeal, we affirm.

## I. Background

{¶ 2} Cottingham was indicted in a 37-count indictment as follows:

Counts 1-4, aggravated burglary in violation of R.C. 2911.11(A)(1) and (2) with one- and three-year firearm specifications;

Counts 5-6, aggravated robbery in violation of R.C. 2911.01(A)(1) with one- and three-year firearm specifications;

Counts 7-8, kidnapping in violation of R.C. 2905.01(A)(2) with one- and three-year firearm specifications;

Count 9, theft in violation of R.C. 2913.02(A)(1) with one- and three-year firearm specifications;

Count 10, improperly discharging into habitation in violation of R.C. 2923.161(A)(1) with one- and three-year firearm specifications;

Counts 11-15, felonious assault in violation of R.C. 2903.11(A)(2) with one- and three-year firearm specifications;

Count 16, improperly discharging into habitation in violation of R.C. 2923.161(A)(1) with one- and three-year firearm specifications;

Count 17, identity fraud in violation of R.C. 2913.49(E);

Count 18, grand theft in violation of R.C. 2913.02(A)(3);

Count 19, Medicaid fraud in violation of R.C. 2913.40(B);

Count 20, forgery in violation of R.C. 2913.31(A)(2);

Count 21, carrying a concealed weapon in violation of R.C. 2923.12(A)(2), with forfeiture specifications;

Count 22, receiving stolen property in violation of R.C. 2913.51(A) with forfeiture specifications;

Count 23, improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B) with forfeiture specifications;

Count 24, tampering with evidence in violation of R.C. 2921.12(A)(1);

Count 25, trafficking in violation of R.C. 2925.03(A)(2) with a one-year firearm specification and forfeiture specifications;

Count 26, drug possession in violation of R.C. 2925.11(A) with a one-year firearm specification and forfeiture specifications;

Count 27, trafficking in violation of R.C. 2925.03(A)(2) with a one-year firearm specification and forfeiture specifications;

Count 28, drug possession in violation of R.C. 2925.11(A) with a one-year firearm specification and forfeiture specifications;

Count 29, trafficking in violation of R.C. 2925.03(A)(2) with a one-year firearm specification and forfeiture specifications;

Count 30, drug possession in violation of R.C. 2925.11(A) with a one-year firearm specification and forfeiture specifications;

Count 31, trafficking in violation of R.C. 2925.03(A) with a one-year firearm specification and forfeiture specifications;

Count 32, drug possession in violation of R.C. 2925.11(A) with a one-year firearm specification and forfeiture specifications;

Count 33, possessing criminal tools in violation of R.C. 2923.24(A) with forfeiture specifications;

Counts 34-37, having weapons while under disability in violation of R.C. 2923.13(A)(1), (2), and (3) with forfeiture specifications.

{¶ 3} After Cottingham pleaded not guilty, Counts 1-16 were tried to a jury, which found him guilty of all counts and specifications. Cottingham then pleaded no contest to Counts 17-37, and the trial court found him guilty of all counts and specifications. At sentencing, the court sentenced Cottingham to 23 years in prison on this case, consecutive to 3 years incarceration in Cuyahoga C.P. Nos. CR-18-612824 and CR-18-614777 (in which Cottingham had pleaded guilty before trial in this case), for an aggregate term of 26 years in prison. This appeal followed. The appeal is limited to the jury trial on Counts 1-16 in this case.

## II. Trial Testimony

{¶ 4} On August 16, 2017, Myles McCall ran into a Cuyahoga Metropolitan Housing Authority ("CMHA") police station shouting "this guy is trying to shoot me." CMHA police officer Manuel Leon assisted McCall, who was breathing heavily, sweating, and acting in an excited manner. McCall told Officer Leon that the person trying to kill him was "some guy named Randy," and that the incident occurred while McCall was visiting his then-girlfriend Shawnta Perry. As other CMHA officers performed a perimeter sweep of the Bundy Drive and King Kennedy areas of Cleveland where McCall said the incident occurred, Officer Leon continued to question McCall to learn what had happened.

{¶ 5} McCall testified that on August 16, 2017, he and his friend Demario were visiting Perry, who lived on Bundy Drive in the King Kennedy CMHA apartment complex. McCall said that he and Perry were in the bedroom having sex when Demario knocked on the door and told them that someone was at the door. McCall testified that the knocking got louder, and then Cottingham, who was holding a gun, kicked in the bedroom door. McCall said that Cottingham then assaulted Perry, hitting her numerous times in the head with his gun and kicking her in her stomach "like he was trying to knock her out so he could get to me." McCall said that he did not know Cottingham before the incident, but learned his name during the assault because Perry kept yelling "Randy stop. Don't do this." McCall testified that during the incident, Cottingham told him to "shut up," and that "people been telling me to line you up."

{¶ 6} McCall testified that Cottingham then told him that the "only thing [that] would make him happy is money," so McCall gave Cottingham his credit card. Cottingham told McCall "you going to come to the ATM with me," and forced him at gunpoint to leave the house. McCall testified that Cottingham had the gun to his head the whole time and told him that he would shoot him if he tried to run. A police car drove by as they were walking outside and Cottingham, who briefly put the gun down, told McCall, "Don't think about running[;] I will shoot you. I don't care about police." McCall said that another male he knew as Buck accompanied them and tried to convince Cottingham to stop what he was doing.

{¶ 7} McCall said that as they entered an alleyway, Cottingham was in front of him and Buck was behind. Sensing an opportunity, McCall ran away and headed toward the CMHA police station. Sergeant Robert Vales testified that he was in the back parking lot of the CMHA police station on August 16, 2017, when a male ran past him shouting that a man was shooting at him. McCall testified that he believed that if he had gone further into the alleyway with Cottingham and not run for his life, Cottingham would have shot him that day.

{¶ 8} McCall subsequently identified Cottingham in a photo lineup as the perpetrator. He said that two weeks after the incident, several of Cottingham's friends told him that Cottingham was drunk during the incident and wanted to apologize. McCall also testified that in early 2018, while Cottingham was in jail awaiting trial, he received a telephone call from a private number, and the caller told him that someone would pay him not to testify.

{¶ 9} Perry testified that she and Cottingham dated for approximately a year but their relationship ended in April 2017. She said that she started dating McCall in May 2017, and that he was visiting her home on August 16, 2017. She corroborated McCall's testimony that while they were having sex in the bedroom, Cottingham kicked in the bedroom door, and she "and Randy [began] tussling while he had a gun in his hand trying to get to Myles." She said that the gun hit her in the face as she and Cottingham were "tussling back and forth, fighting," and Cottingham then kicked her in the stomach.

{¶ 10} Perry also corroborated McCall's testimony that Cottingham demanded money from McCall, and that McCall gave Cottingham his credit card. Perry testified that as Cottingham held McCall at gunpoint, he told him, "You know what time it is." Perry testified further that at the time of the incident, Cottingham did not have permission to be in her home or bedroom, and that his entrance was completely unexpected. She said she was aware that Cottingham carried guns and drove a silver SUV, and she identified pictures of the injuries to her face and the SUV. Perry testified, like McCall, that Cottingham called her two weeks after the incident to apologize.

{¶ 11} Perry also testified that one of Cottingham's friends questioned her when Cottingham was in jail about whether she was going to testify. Perry said that made her "nervous, anxious, and scared" because she thought "something was going to happen if she testified" against Cottingham, and she was worried about her reputation if people in her neighborhood thought she "was telling on him." During

the investigation regarding this case, the police learned that Cottingham made a jailhouse call to his friend Jashon Randall on October 25, 2017, and asked Randall to contact Perry and convince her to write a statement that she had lied about the August 16 incident. Two days later, in another jailhouse call, Cottingham told Randall that his brother, Temarcus Church, had talked to Perry.

{¶ 12} Perry said that on September 23, 2017, she received a telephone call from her uncle, De'Shawnta Boyland, who told her that he was coming to pick her up and take her to her mother's house because he had just been in a fight with Cottingham at a bar, and was worried that Cottingham would retaliate by harming her house. Boyland testified that he and Cottingham were arguing in the bar when Cottingham swung at him and missed. Boyland said that he "got the upper hand" with Cottingham, who then told him "he wasn't taking no losses," and that he would "shoot this bitch up." Boyland said he left the bar, picked up Perry, and took her to her mother's house on Avon Avenue in Cleveland. Perry's mother, Kenyada Perry, and several other people — including Michelle Frost (Kenyada's best friend), George Smith (Kenyada's boyfriend), Willie Jackson (Kenyada's brother), and Perry's children — were already at the house.

{¶ 13} Perry testified that she and others were on the porch of her mother's house around 4:00 a.m. when they saw a silver car, followed by a red car, drive slowly past the house. She said that Jackson told the group to get inside, and after they were inside, "a lot" of shots were fired into the house, and everyone fell to the floor.

{¶ 14} Michelle Frost testified that she was living with Kenyada at the time of the incident, and that Perry and her children were frequently at the house. Frost said that she knew Cottingham and was aware that he and Perry dated at some point in 2017. She said she knew that Cottingham was driving a gray Ford Escape with a 30-day tag around the time of the shootings, and she identified Cottingham's vehicle in multiple photographs.

{¶ 15} Frost testified that a little after 3:00 a.m on September 23, 2017, she and other individuals were on the front porch of the house when a gray Pontiac G-6 without any lights on pulled up. Moments later, a burgundy Ford Escort, also with no lights on, pulled up behind the G-6, and then both vehicles drove away. Frost said that after everyone went inside the house, she observed the same two vehicles drive slowly by the house again several times. Five to ten minutes later, she observed Cottingham's gray SUV pull up to the house, and saw someone wearing a gray hoodie and carrying a gun "with a long clip" exit the vehicle and begin shooting at the house. Frost said there was "smoke everywhere" and bullets were "ricocheting all over" as people scattered through the house looking for somewhere to hide; some hid in closets, others lay on the floor in the bedroom. When the shooting stopped, Frost called the police.

{¶ 16} Officer Geoffrey Walter of the Cleveland Police Department responded at 3:58 a.m. to a report of shots fired into a home on Avon Avenue. He found 20 .233 round shell casings in the middle of the road in front of the home. Additionally, he found large holes in the walls of the house, indicating that a high-

powered weapon had been used, and bullet holes in the windows. Later the same morning, Officer Walter was dispatched to respond to a similar shooting at a home in Newburgh Heights.

{¶ 17} In 2017, De'Shawnta Boyland and his wife lived on East 52nd Street in Newburgh Heights. Immediately after the shooting at Avon Avenue, Boyland called his wife to see if she was at home. After learning that she was staying at her mother's house that evening, Boyland drove to his home in Newburgh Heights and discovered that his house had also been "shot up."

{¶ 18} Narelle Stead, who lived on East 52nd Street only a few doors down from Boyland, testified that she woke up around 3:00 a.m. on September 23, 2017, to the sound of gunshots near her home. Stead looked out her front door and saw an older model "gray, silver, or white" Explorer-type SUV in the road and a Black male running toward it from a few houses down on the left. Stead heard someone in the SUV say "come on," saw the male who was running jump into the SUV, and then saw the vehicle speed off.

{¶ 19} At 4:02 a.m., Newburgh Heights Police Officer Christopher Munk responded to a report of shots fired at a home on East 52nd Street. After speaking with Boyland, Officer Munk determined that Cottingham was the likely suspect. Boyland described Cottingham to Officer Munk as "a guy with tattoos on his face," and showed him a picture of Cottingham from a social media site on his phone. Officer Munk also interviewed several neighbors that morning for information about the shooting.

{¶ 20} John Majoy, the chief of police for Newburgh Heights, obtained footage taken in the early morning hours of September 23, 2017, from several traffic cameras in the area of East 52nd Street. Footage taken at 3:15 a.m. from a camera located at the intersection of Harvard Avenue and East 42nd Street showed the suspected shooter's vehicle driving eastbound on Harvard Avenue toward East 52nd Street. Other footage from a traffic camera at East 52nd Street showed the suspected shooter's vehicle drive towards the camera, then turn westbound onto Harvard Avenue, and then northbound onto I-77. Chief Majoy described the vehicle on the footage as a "lighter-colored Ford Escape."

{¶ 21} Special Agent Christopher Wilson, who worked for the Bureau of Criminal Investigations at the time of the incident, responded to the house on East 52nd Street on September 23, 2017, for evidence collection. Special Agent Wilson collected 20 .223 casings and four .40 round casings from the scene.

{¶ 22} Kristin Koeth, a firearm and tool examiner for the Cuyahoga County Regional Forensic Science Laboratory, testified that she reviewed 40 .223 casings related to the shootings: 20 from the Newburgh Heights incident and 20 from the Avon Avenue incident. Koeth compared the rounds from the two incidents and concluded that all 40 .223 rounds were fired from the same weapon.

{¶ 23} On September 27, 2017, Cleveland Police Detective Elliot Landrau responded to MetroHealth Medical Center regarding three gunshot victims seeking medical treatment. When he arrived at MetroHealth, Det. Landrau observed a gray Ford Escape riddled with bullet holes parked in the emergency drop-off area. Det.

Landrau spoke with the three shooting victims: Tanysia Hamilton, Temarcus Church, and a male who identified himself as Jashon Randall. Church and Randall refused to give Det. Landrau any information about where the shooting occurred and what happened.

{¶ 24} Det. Landrau then reviewed MetroHealth surveillance video of the emergency drop-off area. The video showed that when the gray Ford Escape arrived at the hospital, the male driver exited the SUV, walked over to nearby bushes, and then walked into the Emergency Room. The footage showed the female move from the passenger seat to the driver's seat and then drive the SUV to the drop-off area, where the second male was helped out by medical staff. The next day, Det. Landrau learned that the driver, who identified himself to the detective and medical personnel as Jashon Randall, was actually Cottingham, who was using Randall's name to obtain medical treatment at MetroHealth.

{¶ 25} After looking at the surveillance video, Det. Landrau and other on-scene officers searched the bushes, where Det. Landrau found two handguns. One was a semiautomatic Ruger .45, and the other was a black Smith and Wesson. Det. Landrau later learned that one of the guns had been reported stolen by the Eastlake Police Department. At trial, Cottingham admitted that he had placed the guns in the bushes. Det. Landrau also recovered a black G-Zone phone from Cottingham.

{¶ 26} Det. Landrau testified that the Cleveland police recovered the gray Ford Escape, which had a 30-day tag, for processing. In the SUV, he found multiple rifle magazines that would hold .223 round ammunition, as well as an empty box of

Remington .223 rounds. Officer Munk photographed the SUV while it was impounded in the Cleveland Police Department lot and confirmed at trial that it was the same vehicle seen on traffic camera video leaving the scene of the shooting in Newburgh Heights. During a jailhouse call made by Cottingham on October 20, 2017, to the real Jashon Randall, Cottingham told Randall his car was impounded in the Cleveland impound lot and instructed Randall to retrieve it.

{¶ 27} Christopher Mealy, a detective at MetroHealth, testified that he reviewed surveillance video that showed Cottingham entering MetroHealth's emergency room at 2:54 p.m. on September 27, 2017. He also spoke with Cottingham, who was representing himself to be Jashon Randall. Later, after learning that Randall was actually Cottingham, Det. Mealy obtained a search warrant for Randall's MetroHealth medical records and learned that a Jashon Randall had also been treated at MetroHealth on September 23, 2017. Upon direct examination at trial, Cottingham admitted that he used Randall's name to obtain medical treatment at MetroHealth for a broken jaw on September 23, 2017.

{¶ 28} CMHA Detective Ashley Jaycox testified that upon investigating the cellphone recovered from Cottingham on September 27, 2017, she found a text message received by the phone on September 27, 2017, at the same time Cottingham was receiving medical treatment at MetroHealth, that contained Randall's social security number and instructions that "when you done make [sic] you delete this." Another incoming text asked "who tf is this," and an outgoing text in response stated

"Rambo." Cottingham confirmed during his testimony that his street name is Rambo.

{¶ 29} After a warrant was issued for Cottingham's arrest, Det. Jaycox and other police officers executed the warrant at an apartment on Crestline Avenue where Cottingham's girlfriend lived. Cottingham opened the door in response to the officers' knock, but then unsuccessfully tried to immediately close the door. The officers chased and then tackled Cottingham as he ran toward the back bedrooms of the apartment. After apprehending him, the police obtained a search warrant for the apartment and upon executing the warrant, discovered two firearms under a pillow in one of the back bedrooms. One was a model Thunder 9; the other was a Springfield model XD-40.

{¶ 30} Jeffrey Oblock, a DNA analyst for the Cuyahoga County Regional Forensics Laboratory, analyzed both firearms and found Cottingham's DNA on the surface and magazines of both weapons. Kristin Koeth also analyzed the weapons and determined that the four .40 caliber shell casings recovered from outside Boyland's home in Newburgh Heights were all fired by the Springfield model XD-40 gun recovered from the Crestline Avenue apartment where Cottingham was apprehended.

## III. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 31} Cottingham moved for Crim.R. 29 dismissal of the charges after the state's presentation of the evidence, and he renewed his motion after the defense

rested. In his first assignment of error, Cottingham contends that the trial court erred in denying his Crim.R. 29(A) motion for acquittal because there was insufficient evidence to support his convictions. Specifically, he contends "there is no evidence he committed any of these crimes."

{¶ 32} A Crim.R. 29 motion challenges the sufficiency of the evidence. The test for sufficiency requires a determination of whether the prosecution mets its burden of production at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). We find that the evidence produced by the state was sufficient to support all of Cottingham's convictions.

## B. The August 16, 2017 Incident on Bundy Drive

### 1. Counts 1 through 4, Aggravated Burglary

{¶ 33} Counts 1 through 4 charged aggravated burglary in violation of R.C. 2911.11(A)(1) and (2), which provides that:

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or

in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply: (1) the offender inflicts, or attempts or threatens to inflict physical harm on another; (2) the offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 34} Both Perry and McCall testified that while they were having sex in her bedroom, Cottingham kicked in the bedroom door while carrying a gun in his hand. Perry also testified that she and Cottingham were no longer dating and that on August 16, 2017, he did not have permission to be in her house, and that his entrance was completely unexpected. Accordingly, the state presented sufficient evidence that Cottingham trespassed in Perry's residence by means of force or deception in order to commit a criminal offense therein, the first element of aggravated burglary.

{¶ 35} The state also presented sufficient evidence that Cottingham inflicted and threatened physical harm by means of a deadly weapon while he was trespassing in Perry's home. Both Perry and McCall testified that after he kicked in the bedroom door, Cottingham assaulted Perry by hitting her in the head with his gun and kicking her in the stomach. McCall also testified that Cottingham held a gun to him while demanding money and told him that he would shoot him if he ran. This evidence, if believed, was sufficient to support Cottingham's convictions for aggravated burglary in violation of R.C. 2911.11(A)(1) and (2).

### 2. Count 9, Theft in violation of R.C. 2913.02(A)(1)

{¶ 36} R.C. 2913.02(A)(1) provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control

over either property or services without the consent of the owner or person authorized to give consent."

{¶ 37} Both Perry and McCall testified that Cottingham held McCall at gunpoint and demanded money from him. They both testified that McCall gave Cottingham his credit card in an effort to comply with Cottingham's demand, but that Cottingham told McCall they were going to the ATM together. McCall testified that Cottingham held a gun to him as they left the house and walked to the ATM, and that Cottingham told him that he would shoot him if he ran. This is sufficient evidence to support all the elements of Cottingham's conviction for theft.

### 3. Counts 5 and 6, Aggravated Robbery in violation of R.C. 2911.01(A)(1)

{¶ 38} Under R.C. 2911.01(A)(1), "[n]o person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."

{¶ 39} The state presented sufficient evidence to support Cottingham's conviction for aggravated robbery. Both Perry and McCall testified that after he kicked in the bedroom door and assaulted Perry, Cottingham demanded money from McCall at gunpoint. This evidence is sufficient to establish that Cottingham possessed, displayed, and brandished a deadly weapon while committing a theft offense, thereby establishing the elements of R.C. 2911.01(A)(1).

### 4. Count 7 and 8, Kidnapping in violation of R.C. 2905.01(A)(2)

{¶ 40} Under R.C. 2905.01(A)(2), "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * to facilitate the commission of any felony or flight thereafter." Count 7 related to Perry; Count 8 related to McCall.

{¶ 41} The state presented sufficient evidence that Cottingham used force and threat of force to restrain both Perry and McCall's liberty. Perry testified that Cottingham broke into her bedroom while carrying a gun and then assaulted her by hitting her in the face with his gun. She was not free to end this encounter because of the gun; accordingly, the evidence was sufficient to establish that Cottingham restrained Perry's liberty by force in order to assault her. Likewise, Perry and McCall testified that Cottingham held McCall at gunpoint and demanded money from him. McCall testified further that Cottingham, while holding a gun to his head, moved him from the bedroom, down the stairs, outside the house, and into the alleyway. McCall also testified that Cottingham told him that he would shoot him if he tried to run away. This testimony is obviously sufficient to establish that Cottingham, by force and threat, restrained McCall's liberty and removed him from the place he was found in order to commit a theft offense.

### C. The September 23, 2017 Incidents on Avon Avenue in Cleveland and East 52nd Street in Newburgh Heights

#### 1. Counts 10 and 16, Improperly Discharging Into Habitation in violation of R.C. 2923.161(A)(1)

{¶ 42} Under R.C. 2923.161(A)(1), "[n]o person, without privilege to do so, shall knowingly * * * discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual."

#### 2. Counts 11 through 15, Felonious Assault in violation of R.C. 2903.11(A)(2)

{¶ 43} R.C. 2903.11(A)(2) provides that "[n]o person shall knowingly * * * cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

{¶ 44} It was undisputed at trial that someone knowingly fired a high-caliber weapon into homes on Avon Avenue in Cleveland and East 52nd Street in Newburgh Heights on the morning of September 23, 2017, and attempted to cause physical harm to the people in the homes. Perry testified that she and her family were on the porch of her mother's house on Avon Avenue when her uncle told the group to quickly go inside after they observed two vehicles drive slowly by the house. Perry said that shortly after they went inside, multiple shots were fired into the house, and everyone fell to the floor or hid. Michelle Frost testified that she observed someone wearing a gray hoodie fire a long-clipped weapon into the home. Boyland was at the home on Avon Avenue when the shooting occurred; he immediately went home and discovered that his home in Newburgh Heights had also been "shot up."

{¶ 45} Cottingham's assertion that the state presented insufficient evidence linking him to these crimes is without merit. First, the state presented evidence of the fight between Cottingham and Boyland that occurred prior to the shootings. Boyland testified that several hours before the shootings, he and Cottingham were involved in a fight at a bar. Boyland testified that Cottingham swung at him and missed, and then Boyland "got the upper hand." Cottingham then angrily told Boyland that "he wasn't taking no losses," and that he would "shoot this bitch up." Boyland testified that after this threat, he was so worried that Cottingham would retaliate that he left the bar, picked up Perry from her home, and took her to her mother's house on Avon Avenue. Perry testified that Boyland picked her up because, knowing Cottingham's propensity to anger, he thought that Cottingham would retaliate by targeting her house.

{¶ 46} After the shooting at Perry's mother's house, Boyland immediately called his wife to see if she was home, and then went to his own house, where he discovered it too had been "shot up." When the police arrived, Boyland showed Officer Munk a photograph of Cottingham as the likely suspect.

{¶ 47} Boyland and Perry's testimony clearly links Cottingham to the shootings. Boyland's sense of urgency in getting Perry out of her house indicates that he knew Cottingham would be seeking revenge. Perry's testimony that she "know[s Cottingham] and how his anger is" indicates that Boyland's concern about Cottingham's likely retaliation was not unfounded. It is no mere coincidence that that the homes of Perry's mother and Boyland were subject to multiple gunshots

only a few hours after Cottingham told Boyland that "he wasn't taking no losses" and would "shoot this bitch up."

{¶ 48} The evidence presented by the state regarding Cottingham's gray SUV also linked him to the shootings. Perry identified Cottingham's gray Ford Escape in a photograph labeled as state's exhibit No. 186. Frost testified that she knew Cottingham drove a gray Ford Escape with a 30-day tag, and more specifically, that she knew he had been driving that vehicle around the time of the shootings. Frost identified Cottingham's SUV in state's exhibit No. 186, and importantly, testified that she saw Cottingham's gray SUV pull up in front of the house immediately before the shooting. She watched someone wearing a gray hoodie exit the SUV and begin firing at the house.

{¶ 49} Similarly, Stead testified that when she went to the window after waking to the sound of gunshots near her home on East 52nd Street, she noticed a "gray, silver, or white" Explorer-type SUV in the road and a male running toward the SUV from a few houses down from her. Stead saw the male jump into the SUV and heard someone say "come on" as the SUV sped off towards Harvard Avenue. Chief Majoy testified about traffic camera footage from the morning and time of the shooting in Newburgh Heights that showed a "lighter-colored Ford Escape" driving on East 52nd Street, the street on which the shooting occurred.

{¶ 50} The evidence presented by the state relating to Cottingham's medical treatment at MetroHealth on September 27, 2017, also linked Cottingham's SUV to the shootings. Specifically, Cottingham was observed on video footage arriving at

MetroHealth in a gray Ford Escape. Cleveland police impounded the vehicle, which had a 30-day tag, and while he was in jail, Cottingham made a jailhouse call to his friend Randall in which he admitted that his car was in the impound lot and gave him instructions as to how to retrieve it. Officer Munk confirmed that this SUV was the same vehicle observed on traffic camera footage leaving the scene of the shooting at Boyland's home on East 52nd Street.

{¶ 51} Evidence presented by the state regarding the ammunition recovered from the scenes of the home shootings also linked Cottingham to the shootings. Officer Walter testified that he recovered 20 .223 round shell casings from the middle of the road at the Avon Avenue house. Special Agent Christopher Wilson testified that he recovered 20 .223 shell casings and four .40 round casings near Boyland's house on East 52nd Street. Kristin Keoth analyzed the 40 .223 casings recovered from the scenes and determined that all 40 .223 rounds were fired from the same weapon. During the search of Cottingham's vehicle at the impound lot, Det. Landrau found multiple rifle magazines that held .223 round ammunition, and an empty box of .223 rounds.

{¶ 52} Further, upon executing the search warrant at the house on Crestline Avenue where Cottingham was apprehended, police recovered two firearms — a Thunder 9 and a Springfield model XD-40. Jeffrey Oblock testified that Cottingham's DNA was found on both weapons, and Koeth determined that the four .40 cartridge casings recovered from the scene at East 52nd Street were all fired by the Springfield model XD-40 weapon recovered at the Crestline apartment.

**{¶ 53}** Finally, the state presented evidence of Cottingham's consciousness of guilt. The evidence demonstrated that Cottingham used Randall's identification information at MetroHealth on September 23 and September 27, 2017, to hide his identity because he knew the police were looking for him after the August 16, 2017, incident involving Perry and McCall. Then, while he was in jail awaiting trial, Cottingham made numerous jailhouse phone calls in an attempt to silence potential witnesses. These calls were played for the jury. On October 25, 2017, Cottingham called Jashon Randall to confirm that Randall had reached out to Perry to obtain an affidavit from her that she had lied about the August 16, 2017, incident. On May 28, 2018, Cottingham called his friend Julius, who is also friends with Boyland, to discuss reaching out to Boyland about his testimony. Another jailhouse call from Cottingham corroborated McCall's testimony that someone offered him money not to testify. Upon cross-examination, Cottingham admitted that he used other inmates' personal identification numbers to make the jailhouse calls to hide his actions from the prosecution.

**{¶ 54}** This evidence, viewed in a light most favorable to the prosecution, all points unequivocally to Cottingham as the perpetrator of the shooting incidents on September 23, 2017, and is sufficient to support Cottingham's convictions for improperly discharging a firearm into a habitation and felonious assault.

**{¶ 55}** The first assignment of error is therefore overruled.

### D. Manifest Weight of the Evidence

{¶ 56} In his second assignment of error, Cottingham contends that his convictions were against the weight of the evidence.

{¶ 57} In reviewing a claim challenging the manifest weight of the evidence, the appellate court must determine whether "there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 81. This court examines the entire record in order to determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *Id.* A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 388, 678 N.E.2d 541 (1997).

{¶ 58} This is not that exceptional case. After a careful review of the entire record and for the reasons discussed above, we cannot say that the jury lost its way in convicting Cottingham of all offenses as charged. The second assignment of error is overruled.

### E. Joinder

{¶ 59} In his third assignment of error, Cottingham contends that the trial court erred in denying his Crim.R. 14 motion for separate trials on Counts 1 through 9, involving the August 16, 2017 incident at Perry's home, and Counts 10 through 16,

involving the two shooting incidents on September 23, 2017, because the incidents were unrelated to each other and occurred more than a month apart.

{¶ 60} This court reviews a trial court's decision on joinder for an abuse of discretion. *State v. Wilson*, 8th Dist. Cuyahoga No. 102921, 2016-Ohio-2718, ¶ 21.

{¶ 61} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In fact, "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992).

{¶ 62} Cottingham argues that the August 16, 2017 incident was unrelated to the September 23, 2017 shootings because "one [incident] deals with going into a residence and the other has to do with a drive-by shooting." He contends that the incidents did not involve the same acts or the same course of criminal conduct and were separate incidents that should not have been joined for trial.

{¶ 63} Cottingham's argument is without merit because it is apparent that the incidents were connected and involved a common scheme or plan. Cottingham was angry that his ex-girlfriend was with another man and that her uncle bested him

in a fight. As a result, he "shot up" the homes of his ex-girlfriend's mother and her uncle. In light of the connection between the incidents, joinder under Crim.R. 8(A) was appropriate. Nevertheless, Cottingham contends that he was prejudiced by their joinder because "the two incidents spilled over into each other in the minds of the jurors."

{¶ 64} A defendant may move to sever charges under Crim.R. 14 if it appears that the defendant may be prejudiced by joinder of the offenses. *Wilson*, 8th Dist. Cuyahoga No. 102921, 2016-Ohio-4158 at ¶ 31. The defendant bears the burden of proving prejudice. *State v. Payne*, 8th Dist. Cuyahoga No. 107825, 2019-Ohio-4158, ¶ 31. The state can rebut the defendant's claim of prejudicial joinder by showing that (1) the evidence from the other case could have been introduced pursuant to the "other acts" test of Evid.R. 404(B); or (2) the evidence of each crime joined at trial is "simple and direct." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 96.

{¶ 65} The "simple and direct" evidence is satisfied when evidence is simple and direct enough that the jury can easily segregate the evidence. *State v. Johnson*, 88 Ohio St.3d 95, 110, 723 N.E.2d 1054 (2000). "A trier of fact is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lander*, 8th Dist Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33, citing *Torres*, 66 Ohio St.2d at 343-344, 421 N.E.2d 1288.

{¶ 66} At trial, Perry and McCall testified regarding the incident that occurred on August 16, 2017. Boyland testified about his fight with Cottingham that

led to the subsequent shoot-ups of his house and Perry's mother's house on September 23, 2017. Frost and Stead testified about their observations of Cottingham's car at the scene of each shooting, and Det. Landrau testified about how Cottingham's car was recovered by the police from the MetroHealth emergency drop-off area. Various other witnesses testified about the shell casings recovered at the scene of each shooting, the recovery of firearms from the apartment where Cottingham was arrested, and the DNA results showing Cottingham's DNA on one of those weapons. Det. Jaycox testified about Cottingham's jailhouse calls, in which he tried to get his friends to manipulate Perry, McCall, and Boyland to not testify against him.

{¶ 67} The evidence for the separate incidents that occurred on August 16, 2017, and September 23, 2017, was separate and uncomplicated, and a reasonable juror could easily segregate the evidence because there was no overlap of proof. The "simple and direct" test was met in this case and, accordingly, Cottingham was not prejudiced by the joinder of the offenses.

{¶ 68} If the state satisfies the "simple and direct" test, an accused is not prejudiced by joinder regardless of the nonadmissibility of the evidence under Evid.R. 404(B). *Payne*, 8th Dist. Cuyahoga No. 107825, 2019-Ohio-4158 at ¶ 37, citing *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. Accordingly, we need not consider whether the state met the "other acts" test for joinder. The joint trial in this case was not improper, and the trial court did not abuse its discretion in denying the motion to sever. The third assignment of error is therefore overruled.

### F. Other Acts Evidence

{¶ 69} In his fourth assignment of error, Cottingham contends that the trial court erred in allowing improper "other acts" evidence to be admitted at trial.

{¶ 70} Evid.R. 404(B), governing other crimes, wrongs, or acts, provides, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

{¶ 71} Evid.R. 404(B) does not apply to this case, however. Despite Cottingham's argument, the state's evidence of the separate criminal acts was not "other acts" evidence; it was evidence regarding the very crimes Cottingham was charged with committing. Furthermore, although Cottingham contends that improper "other acts" evidence was admitted at trial, he does not identify any evidence that was allegedly improperly admitted, but only generally asserts that "the testimony of each incident spill[ed] over onto the other," "the state relied on inferences to implicate the defendant as being a gun-toting criminal," and "the sole purpose of the testimony elicited by the state was to show that he acted in conformity with the crimes of which he was charged." (Appellant's brief, p. 26.) If evidence exists that can support an assignment of error, it is not the duty of the appellate court to root it out. *State v. Gulley*, 8th Dist. Cuyahoga No. 109045, 2020-Ohio-3597, ¶ 32. "We are not obliged to scour the record in search of evidence to support an

appellant's assignment of error." *State v. Patterson*, 2017-Ohio-8318, 99 N.E.3d 970, ¶ 37 (8th Dist.).

{¶ 72} Because Cottingham provides no factual basis from the record to support his blanket assertions that improper "other acts" evidence was improperly admitted, we need not consider this assignment of error further. The fourth assignment of error is overruled.

### G. Cottingham's Juvenile Record

{¶ 73} In his fifth assignment of error, Cottingham asserts that the trial court erred in permitting the state to question him about his juvenile record.

{¶ 74} Generally, pursuant to Evid.R. 609(D) and R.C. 2151.358(H), the state is barred from introducing evidence of a defendant's juvenile adjudications at trial. However, "'when a defendant in a criminal case is permitted to introduce evidence of his life history, he waives the protection of [the prior version of R.C. 2151.358] and may be cross-examined with reference to the disposition of any charge preferred against him as a juvenile.'" *State v. Phillips*, 8th Dist. Cuyahoga No. 96329, 2012-Ohio-473, ¶ 59, quoting *State v. Marinski*, 139 Ohio St. 559, 41 N.E.2d 387 (1942).

{¶ 75} During direct examination, Cottingham testified that he was a hard-working individual who took care of Perry's children and paid her household bills. (Tr. 1375, 1381, 1419, and 1422.) He also untruthfully testified that "I've been convicted of drugs and guns. Nothing in the nature of burglary, robbery, nothing in that state, just guns and drugs." (Tr. 1376.)

{¶ 76} The state questioned Cottingham about his juvenile adjudications for robbery with a gun specification, burglary, and attempted burglary only after Cottingham testified about his life history, including that he had never been convicted of burglary or robbery. This testimony allowed the state to use the *Marinski* exception to ask about Cottingham's juvenile adjudications. The fifth assignment is overruled.

### H. Consecutive Sentences

{¶ 77} Cottingham's sixth assignment of error asserts that the trial court did not make the requisite statutory findings to impose consecutive sentences.

{¶ 78} Consecutive sentences may be imposed only if the trial court makes the required findings pursuant to R.C. 2929.14(C)(4). *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 20-22. The court must both make the statutory findings under R.C. 2929.14(C)(4) at the sentencing hearing and incorporate those findings into its sentencing entry. *Id.* at the syllabus.

{¶ 79} Despite raising the trial court's failure to make the requisite statutory findings as an assignment of error, Cottingham concedes in his appellate brief that the trial court both made the required findings for the imposition of consecutive sentences at the sentencing hearing and incorporated those findings into its journal entry of sentencing. Our review of the record demonstrates likewise. Accordingly, the sixth assignment of error is overruled.

{¶ 80} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

MARY J. BOYLE, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR